UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

ARTHUR GRACE,                          :

             Plaintiff,       :

    - against -                     :     **OPINION**

CORBIS SYGMA f/k/a SYGMA PHOTO         :     02 Civ. 8597 (DC)
NEWS, INC., SYGMA S.A.R.L., f/k/a
SYGMA PARIS, CORBIS CORPORATION,       :

            Defendants.     :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/30/08

**APPEARANCES:**   EMERY CELLI BRINCKERHOFF & ABADY LLP
              Attorneys for Plaintiff
                    By:  Jonathan S. Abady, Esq.
                        Ilann M. Maazel, Esq.
                        O. Andrew F. Wilson, Esq.
              75 Rockefeller Plaza, 20th Floor
              New York, NY  10019

              DORSEY & WHITNEY LLP
              Attorneys for Defendants
                    By:  Douglas C. Fairhurst, Esq.
                        Jeffrey L. Loop, Esq.
               250 Park Avenue
              New York, NY  10177

**CHIN, D.J.**

      In this case, following a bench trial, I awarded

plaintiff Arthur Grace $472,000 in damages.  See Grace v. Corbis

Sygma, 403 F. Supp. 2d 337, 351 (S.D.N.Y. 2005) ("Grace I").

Grace appealed, arguing that the amount awarded was inadequate.

See Grace v. Corbis-Sygma, 487 F.3d 113, 114 (2d Cir. 2007)

("Grace II").  The Second Circuit did not rule on the adequacy of

the award of $472,000, but vacated the judgment and remanded for

further proceedings because, as it wrote, "it appears to us that,

in assessing damages in this case, the District Court applied an arbitrary methodology." Id. at 120. The Circuit held that this Court's explanation of its decision on damages was "inadequate." Id. Accordingly, the Circuit instructed as follows:

> We are therefore remanding this case with instructions to the District Court to develop and apply an appropriate methodology, as well as to make appropriate factual findings essential to arrive at a reasonable assessment of damages. We do so without any restrictions whatsoever upon the District Court in seeking additional data or in conducting such evidentiary hearings as it may deem necessary to enable it to make findings related to the evidence and germane to the formula to be applied in the ultimate assessment of damages.

Id. at 121.

On remand, Grace submitted additional evidentiary materials that had not been offered at trial in this case: (1) an expert report prepared in August 2007 setting forth certain damages computations, including present value and interest calculations (Wilson Aff. Ex. C); and (2) copies of Form 1099s issued to Grace by defendant Corbis Corporation ("Corbis") or its predecessors from 1987 through 1998 and 2000 through 2002 (id. Ex. D). Corbis objects to this "new" evidence. (Def. Mem. 3).[1]

The parties briefed the issue of damages and I heard oral argument on October 18, 2007.

---

[1]    In addition, Grace submitted a chart summarizing Grace's royalties (Wilson Aff. Ex. E), copies of Sygma's monthly licensing records for 1996 (id. at Ex. F), and Sygma's monthly licensing records for 1999 (id. at Ex. G). These are not objectionable because they were received in evidence at trial or in post-trial submissions.

**DISCUSSION**

As an initial matter, I address the admissibility and probative value of the "new" evidence offered by Grace.  I then consider the amount of damages to award to Grace.

**A.    The "New" Evidence**

**1.    The 1099s**

For the first time in this litigation, Grace offers the 1099s as evidence of his annual revenues from Corbis and Sygma. The 1099s show "nonemployee compensation" (1987 through 1998) and "royalties" (2000 through 2002) paid to Grace by Sygma and Corbis.[2]  Grace has not provided a 1099 for 1999.  The amounts on the 1099s are shown in dollars and do not match the royalty figures presented at trial.  (<u>Compare</u> Wilson Aff. Ex. C <u>with</u> Ex. D).

Corbis's objection to the 1099s is sustained.  The trial record closed long ago.  Grace could have but did not offer the 1099s at trial.  Nor did he produce the 1099s in discovery, even though Corbis, in December 2003, asked him to produce "[d]ocuments showing royalties and fees received from defendants for the licensing for plaintiff's images from the year 1972 through May 2001."  (Def. Mem. 6 & n.3 (quoting Def. Initial

---

[2]    All the 1099s have a box for "royalties" and a box for "nonemployee compensation."  (Wilson Aff. Ex. D).  The 1987 through 1998 1099s were issued by Sygma, and the amounts were entered in the "nonemployee compensation" box.  The 2000 through 2002 1099s were issued by Corbis and the amounts were entered in the "royalties" box.

Request for Production of Documents)); see also 10/18/07 Tr. 7).
He cannot very well now rely on documents that he failed to
produce in discovery and did not offer at trial.[3]

Moreover, the case was tried based on Sygma's and
Corbis's royalty records, not on the 1099s or any other Internal
Revenue Service forms.  At trial, Corbis offered Defendants'
Exhibits T-1 and T-2 through a Corbis employee, Angeline Petrovic
Stojiljkovic ("Petrovic"), who prepared the exhibits based on the
Corbis/Sygma royalty records.  (Trial Tr. 829-33).  Grace's
attorney's "only objection" was that the exhibits had just been
provided and he needed time to review them (id. at 838); the
exhibits were summaries of royalty statements that had been
previously produced and had been received at trial in evidence
(id.).  I overruled the objection, but stopped the trial for the
day so that Grace's attorney, Edward Greenberg, Esq., could
review the exhibits before cross-examining Petrovic.  (Id. at
838-39).

The next morning, we had a further discussion about the
exhibits.  Greenberg complained that there continued to be issues
with respect to missing images.  (Id. at 846-47).  We had the
following colloquy:

> THE COURT:  . . . [Defendant's Exhibit T-1]
> is a summary of documents that have been

---

[3]     Grace argues that the 1099s were Corbis's own documents
and that Corbis also did not produce them in discovery.
(10/18/07 Tr. 7-8).  These arguments are rejected.  First, Corbis
is not seeking to rely on them.  Second, Grace still had an
obligation to produce them, as Corbis requested them in
discovery.

produced.  You have had it since 4:00 o'clock
yesterday.

To the extent you want to address it in
your post-trial submissions, you can, but I
think we should proceed.

MR. GREENBERG:  Fine.  That is acceptable,
your Honor.

. . .

THE COURT:  I mean, the record is going to
close when we are finished in terms of the
evidence, but you are free to make arguments.
If there is something you want to do in terms
of a rebuttal case, you can call Mr. Grace
today before he leaves if you want for a few
minutes to address this.

I think, look, it seems to me this is a
rather simple thing.  Corbis took all of its
records and listed the income from over the
years from 1990 through 2002.  I mean, it is
voluminous in the sense that it is 17 pages
and there are lots of stories, that is true,
but, I mean --

MR. GREENBERG:  It may also indicate, your
Honor, that the defendant is holding
additional images.  That is what my client
needs an opportunity to look at.

THE COURT:  The testimony was that these
numbers were generated from the financial
information provided by the accounting
department, number one, so it doesn't
necessarily mean that the defendants are
holding images, but as Mr. Fairhurst has
conceded, there are more images, more images
are coming, it's a matter of --

MR. FAIRHURST:  And it wouldn't make any
difference.  This is an income stream.  It
shows what licenses out.  It has nothing to
do with anything else.

THE COURT:  I understand the point of the
exhibit.  The point of the exhibit is simply
to show what the income stream was over the
years and that's what it was intended to
show.

- 5 -

I don't know, and by the way, let me
also say this:

Mr. Grace should have some idea of what
his income stream was over the years from his
own records or his own recollection, and if
he has a different point of view, he is free
to testify to it.

In other words, if he thinks these
numbers are wrong based on his own records,
if he has records, or based on his own
recollection, then he can testify to it.

MR. GREENBERG:  But, your Honor, we can
address this in the written submission?

THE COURT:  You can address it in the written
submission.  What you cannot do is offer
additional evidence because once the record
closes the record closes, unless I reopen the
record.  But the point of the trial, you
know, we have a trial, we take the evidence,
we close the record and then you can make
whatever arguments you want to make.  But in
the meantime, do the best you can.

MR. GREENBERG:  Thank you, Judge.

(Id. at 847-49) (emphasis added).

Hence, at trial, I specifically raised the issue of
whether Grace had documents to show that Corbis's royalty
statements were wrong and whether Grace had even a recollection
as to his income stream that was different from what Corbis's
records in evidence showed, and I specifically invited Grace to
offer any such documents or to take the stand to testify in
rebuttal.  Grace did not offer the 1099s then, or any other
documents, nor did he retake the stand to give rebuttal
testimony.  (See id. at 1007, 1065).

Greenberg did cross-examine Petrovic, but he did not
seriously attack the accuracy of the tables as to income stream.

- 6 -

(Id. at 849-59).  In fact, at the conclusion of Petrovic's

testimony, I had the following exchange with Greenberg:

> THE COURT:  Is there a challenge, without
> holding [you] to the precise Euro, is there a
> challenge generally to the ballpark numbers
> in terms of what the income stream was from
> 1990 through 2002?
>
> MR. GREENBERG:  No, ballpark numbers, no,
> your Honor.

(Id. at 859).  Hence, in the end, through his attorney, Grace

agreed that Corbis's numbers with respect to income stream, as

reflected in Defendants' Exhibits T-1 and T-2, were generally

accurate.  When Corbis offered the parallel exhibits for the New

York license royalties, Greenberg had no objection at all.  (Id.

at 872-74).

In his post-trial brief, Grace challenged the accuracy

of the exhibits, but only to a limited extent.  He noted --

correctly -- that there was a substantial error in Defendant's

Exhibit T-2, which listed zero income for Paris for 1990 when in

fact Grace was paid some 67,000 francs (or, when converted to

U.S. dollars, $13,250).  (See Pl. Post-Trial Br. 21 & n.10).  In

my decision, I recognized that there was an error in T-2 and

adjusted for it.  See Grace I, 403 F. Supp. 2d at 344 n.11.

While Grace did challenge whether the summary charts were

accurate in other respects (e.g., the listing of stories

available for licensing), he did not challenge whether the charts

accurately reported the income streams, i.e., the royalties paid

to Grace, except with respect to the error for Paris for 1990.

(See Pl. Post-Trial Br. 21-24).  While Grace submitted a new

summary chart purporting to show royalties paid to him from 1979 through 2002, the chart was inaccurate because it showed numbers for Paris from 1979 through 1993 as U.S. dollars when the numbers were actually in French francs.  (Id. at Ex. 2).  Hence, the numbers were grossly overstated.  See Grace I, 403 F. Supp. 2d at 344 n.12.  More significantly, Grace did not, with his Post-Trial Brief, submit the 1099s or any other documentation of licensing revenues, nor did he otherwise take issue with the accuracy of Corbis's royalty records.  He never challenged the accuracy of the underlying monthly royalty statements.

Nor has Grace offered any explanation as to why he did not produce the 1099s in discovery, or why he did not offer them at trial, or why he did not produce them after I specifically invited him to produce any additional evidence he might have to contradict Corbis's royalty reports.  To the extent Grace argues that he had no reason to submit the 1099s at trial because he was proceeding on a different damages theory, he was still on notice that the income stream was an issue at trial, and thus he should have offered the 1099s then or he should have asked for an opportunity to submit them later.  He did neither.  (See 10/18/07 Tr. 12).

Finally, even if I were to consider the 1099s, they are not "self-evident," as Grace's counsel suggests.  (10/18/07 Tr. 12).  Although there are discrepancies between the 1099s and the Corbis/Sygma royalty statements, I have been provided with no explanations.  Moreover, while the amounts on the 1099 exceed the

amounts from the New York and Paris royalty statements in some
years (e.g., 1990), in some years it is the reverse (e.g.,
1994).[4]  It would be pure speculation for me to conclude that the
1099s correctly reflect Grace's income stream and that the
royalty statements do not.  It may be that there are differences
in the accounting methods used for the royalty statements,
particularly in Paris, and those used in the United States, e.g.,
accrual basis vs. cash basis.  In addition, the Sygma 1099s
(which constitute the majority of the 1099s) report "nonemployee
compensation"; this may include more than just royalty payments.[5]
For example, these figures may include reimbursements for travel
and other expenses.  Indeed, in some circumstances a company must
report on a 1099 reimbursements paid to an independent contractor
for travel and other expenses.[6]  In light of Grace's extensive

---

[4]     The comparison is difficult to make because the parties
submitted amounts in U.S. dollars, French francs, and Euros,
without providing conversions.  See Grace I, 403 F. Supp. 2d at
344 nn.10, 11, 12.

[5]     Notably, the 1099s issued by Corbis (2000, 2001, and
2002) reported the compensation in the "royalties" box, and these
figures are much lower than the amounts reported by Sygma as
"nonemployee compensation."  (See Wilson Aff. Ex. D (2000
($6,373), 2001 ($3,973), 2002 ($1,250))).

[6]     Of course, there is no evidence in the record in this
respect.  For what it is worth, I take judicial notice of the
2008 Department of Treasury instructions for Form 1099-MISC,
which provide in part as follows:

**Box 7.  Nonemployee Compensation**

Enter nonemployee compensation of $600 or
more.  Include fees, commissions, prizes and
awards for services performed as a
nonemployee . . . .

traveling, presumably he had substantial travel expenses.  See
Grace I, 403 F. Supp. 2d at 339-40 (describing travels all over
world).  (See 10/18/07 Tr. 47).  The record is silent on whether
Sygma or Corbis reimbursed him for travel expenses, and, if so,
whether they reported the reimbursements on the 1099s.

If I were to allow the 1099s as evidence now, fairness
would require that I give Corbis additional time for discovery,
for it would be entitled to investigate the apparent
discrepancies and to see what is included in the "nonemployee
compensation" reported in the 1099s.  The 1099s date back to
1987, and most of them pre-date Corbis's acquisition of Sygma's
collection.  Corbis's counsel represents that "the personnel who
might have known anything about the subject [of the differences
between the 1099s and monthly royalty statements] hav[e] long
departed from Sygma and Corbis."  (Def. Mem. 6).  Even if these
witnesses could be found, additional depositions would be
required.  Corbis would be entitled to examine Grace as to the
reimbursement of expenses.  And following the completion of any

---

**Examples.**  The following are some examples of
payments to be reported in box 7.

. . .

●    A fee paid to a nonemployee, including
an independent contractor, or travel
reimbursement for which the nonemployee did
not account to the payer.

(2008 Instructions for Form 1099-MISC, at 5-6, available at
http://www.irs.gov/pub/irs-pdf/i1099msc.pdf (last visited
1/25/08)).

such discovery, additional expert analyses could be required, and the record would then have to be reopened so that the additional evidence could be presented. Under all the circumstances, including the absence of any explanation for Grace's failure to produce the 1099s or to offer them at trial, I conclude that further delay would not be in the interest of justice.[7]  Corbis's objection to the 1099s is sustained.

### 2.  **The Expert Report**

In his papers on remand, Grace also submits an expert's report, prepared by Conrad Berenson, Ph.D. (Wilson Aff. Ex. C). The report makes present value calculations, based on certain assumptions provided by Grace's counsel. The report also contains comments on the damages analysis made by Leo Zatta, Corbis's expert who testified at trial (and was subject to cross-examination). Corbis objects on the grounds Grace never submitted an expert's report in discovery; Grace did not submit expert testimony at trial; and Berenson has not been subjected to cross-examination.

Corbis's objection is sustained in part and overruled in part. To the extent, Berenson is merely making calculations based on assumptions provided by counsel, the objection is

---

[7]    It is true, as Grace notes, that the Second Circuit instructed in <u>Grace II</u> that I was free, on remand, to seek additional data or conduct additional hearings. I do not take this instruction to mean that I am required to take additional evidence, but simply that I have the discretion to do so. Under all the circumstances, I exercise my discretion not to allow the 1099s.

overruled.  For example, I do not interpret Berenson's report as opining that a 1.8% or 2% per year discount rate is appropriate; I construe his report merely as providing mathematical computations based on numbers, including discount rates, supplied by Grace's counsel (presumably based on evidence in the record or judicially noticeable facts).

To the extent Berenson purports to comment or opine on Zatta's analysis, Corbis's objection is sustained.  Any comment on Zatta's analysis or any counter-analysis should have been provided in discovery and presented at trial, when Berenson could have been cross-examined.  It is too late to offer these opinions now.

B.  **The Award of Damages**

In its decision, the Second Circuit suggested a methodology for assessing damages, which it believed would be "appropriate in light of the record information." Grace II, 487 F.3d at 121.  The Circuit recognized that its suggested methodology was not the only possible method for making a "reasonable" determination of damages based on the evidence in the record.  Id.  I will follow the Circuit's suggested methodology, although I will make adjustments where I deem them appropriate.

The Circuit suggested as follows:  First, the District Court should "ascertain, as nearly as reasonably possible, the number of lost images." Id.  Second,

the District Court might next consider

> factoring in Grace's past annual earnings,
> perhaps utilizing the <u>Bigelow</u> principle
> . . . . Application of this principle at this
> juncture requires identification of Grace's
> highest earning year and the assumption that
> that year represented the collection's
> earning capacity.  The District Court may
> determine that this assumption takes care of
> the gap between "past earnings" and "earning
> potential.

<u>Id.</u>[8]  Third, the next step would be "to ascertain the percentage

of lost images . . . . This would be accomplished by dividing the

number of lost images by the total number of images consigned to

Sygma over the years."  <u>Id.</u>  Fourth, the resulting percentage

(lost images divided by total consigned images) would be

multiplied against the amount of earnings from the highest-

earning year to yield a figure for earnings per year from lost

images; in other words, this would be the annual revenues that

Grace would have earned had the images not been lost.  <u>Id.</u> at

122.  Fifth, the Court would determine the revenues that would

have been generated by the lost images had they not been lost.

<u>Id.</u>  This would be done by multiplying the annual earnings

potential by the number of years the lost images would have

continued to be a source of revenue.  <u>Id.</u>  This would require

determining:  (a) when the images were lost (whether at one time

or over a period of time), (b) how long the lost images would

---

[8]     <u>See</u> <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251,
264 (1946) (where defendant's wrongdoing prevents plaintiff from
proving damages with precision, factfinder may make a "just and
reasonable estimate" of damages).  The Second Circuit observed in
this case that the <u>Bigelow</u> principle should be applied in any
case only once.  <u>Grace II</u>, 487 F.3d at 121 n.1.  (<u>See also</u>
10/18/07 Tr. 36-37 (parties agreeing <u>Bigelow</u> principle can be
applied only once)).

have continued to generate revenue (had they not been lost), and
(c) and whether the level of revenues would have changed over
time (i.e., whether revenues would have changed over time).  See
id.  Some of this income would have been lost in the past (from
the time they were lost to date) and, if the images would have
continued to generate revenue into the future, some of this
income would be lost in the future.  Sixth, the District Court
should discount to present value "the stream of future income
that the images are expected to produce." Id. at 123.  This
would entail a determination of the appropriate discount rate.
Id. at 123-24.  Seventh, the District Court is to separately
assess pre-judgment interest on lost past revenues in accordance
with New York law.  Id. at 124.

I apply the Second Circuit's methodology.

### 1.   The Number of Lost Images

At oral argument, the parties "stipulated that the
number of lost images is 45,000." (10/18/07 Tr. 36 (both sides
agreeing to 45,000)).  Based on this stipulation, I find that the
number of lost images is 45,000.

### 2.   Grace's Highest Earning Year

In Grace II, the Circuit concluded that Grace's highest
earnings came in 1979 for Paris ($19,970.72) and in 1999 for New
York ($1,288.09).  487 F.3d at 121.  Grace contends that the
Circuit was mistaken in these conclusions.  (10/18/07 Tr. 14-15;
Pl. Mem. 13-14 & n.6).  Grace is correct.  In fact, the highest

year for Paris is 1996, when the revenues were $23,905.66,[9] and while 1999 was the highest year for New York, the amount was actually $8,508.44.

I decline to use the 1996 figure for Paris, however, because I find that the 1996 figure is not an accurate basis for determining revenues from lost images. As the 1996 royalty statements for Paris show, the overwhelming majority of the revenues that year -- $18,505.37 of the total of $23,905.66[10] -- were from images of Robin Williams, Christopher Reeve, and Billy Crystal. These images were not lost, and, in fact, the Williams's images were "sold" by Grace to the Williams family. See Grace I, 403 F. Supp. at 340 & n. 3, 344, 347 & n.17. (See also Pl. Repl. Mem. 13; Def. Mem. 11). Hence, it is not fair to include revenues from the Williams, Reeve, and Crystal images in the calculation of revenues from lost images.

Instead, I use the 1979 figure for Paris, $19,970.72, which is the next highest number for Paris. The sum of $19,970.72 and $8,508.44 (the correct figure for New York for

---

[9]    I made the same error in Grace I. See 403 F. Supp. 2d at 344.

[10]    I calculated this number by adding up the royalties paid in 1996 for images of Robin Williams (alone or with his family or from his movies), Christopher Reeve, and Billy Crystal, as shown in the monthly statements for 1996 for Paris. (Wilson Aff. Ex. F). These statements are in French francs, with the monthly totals given in both francs and U.S. dollars. Based on the information provided in francs, I calculated the percentage of francs attributable to the Williams-Reeve-Crystal images (77.41%) out of the total francs for the year, and I multiplied that percentage against the U.S. dollar total for the year ($23,905.66) to obtain $18,505.37.

1999) is $28,479.16.  I adopt this number, and assume that this aggregate figure "represented the collection's earning capacity." Grace II, 487 F.3d at 121.  As the Circuit suggested, "this assumption takes care of the gap between 'past earnings' and 'earning potential.'"  Id.  In making this calculation, I apply the Bigelow principle here, as the Circuit suggested.  Id.

### 3.  **The Percentage of Lost Images**

In Grace II, the Circuit referred to the number of "non-lost images not in dispute" as 33,013.  487 F.3d at 121. This number was drawn from Plaintiff's Exhibit 2A, which alleged (or, more accurately, estimated) that 33,013 original images had been returned.  (PX 2A; Trial Tr. 670).  That number must be updated, because additional images were returned after the exhibit was received in evidence.

The parties disagree as to whether the 33,013 number included 2,024 images returned by Time magazine.  (Compare Pl. Repl. Mem. 13-14 with Def. Mem. 10-11).  I find that it does. (See Trial Tr. 670 (Grace's counsel representing PX 2A included returns from Time)).  The 33,013 number does not include, however, the following returns:

| Source | No. of Images |
|---|---|
| Newsweek | 220 |
| C. Reeve | 144 |
| R. Williams/B. Crystal | 507 |
| Stock Boston | 100 |
| Total | 971 |

(See Def. Mem. 10-11 (with citations to record); Pl. Repl. Mem.

13, 20-21).  I add 971 to 33,013 for a total of 33,984 returned images.

The 45,000 lost images and the 33,984 returned images total 78,984 images.  Dividing 45,000 lost images by the total of 78,984 images yields 56.97%, which I will round off to 57%.  See Grace II, 487 F.3d at 121.  The percentage of lost images is 57%.

### 4.  Annual Earnings from Lost Images

Taking 57% of the highest aggregate year revenue of $28,479.16 yields $16,233.12, which I round off to $16,233, in potential earnings per year from lost images.  See Grace II, 487 F.3d at 121-22.  This figure is generous, as Grace's annual income (both Paris and New York) averaged only $11,002 from 1990 through 2002.  See Grace I, 403 F. Supp. 2d at 344 & n.11. Nonetheless, I will use the figure $16,233.

### 5.  Lost Revenues

Next, I determine the lost revenues, both past and future.  This requires determinations of when the images were lost, how long the lost images would have generated income had they not been lost, and whether the revenue stream would have changed over time.

It is impossible to determine with any certainty when the 45,000 images were lost.  As the Circuit noted was likely, Grace II, 487 F.3d at 122, I find that different images were lost at different times, over the course of many years.  I reach this conclusion because of the manner in which the photographs were submitted, processed, sent to clients, and returned (or not

returned).  See Grace I, 403 F. Supp. 2d at 341-44.  I cannot
determine which images were lost when, but I will assume, as
Grace suggests, that the images were lost in July 1989 (I will
use July 15, 1989), approximately the half-way point between when
Grace began giving images to Sygma and this Court's initial
decision.  (See Pl. Mem. 15).  From July 15, 1989 to today
(January 31, 2008) is approximately 18.54 years.

As for the duration the images would have generated
income, Grace argues that the period is 107 (or more) years --
15.975 years from July 1989 through December 2005 (when my first
decision was issued), plus 1.52 years from December 2005 through
June 2007 (the date of Berenson's expert report), plus 20.5 years
from June 2007 for Grace's life expectancy, plus 70 years for the
remainder of the copyright life of the images.  (See Pl. Mem.
15).  Grace then argues that his lost images would generate the
annual earnings amount (according to Grace, $34,178 or,
alternatively, $18,800) every year for the entire 107 years.
(See Pl. Mem. 15-16).

As Grace's counsel seemed to concede at oral argument,
this position is not reasonable.  (10/18/07 Tr. 17-18).  The
majority of the lost images were photographs of news events from
the 1970s and 1980s and of individuals who were newsworthy in the
1970s and 1980s.  Grace I, 403 F. Supp. 2d at 340.  These
included school busing and desegregation in Boston in 1974 and
1975; President Jimmy Carter and his administration; the 1980
presidential campaign; the efforts in the Middle East in the

1980s; the Solidarity movement and martial law in Poland in the 1980s; the U.S. invasion of Grenada in 1983; Geraldine Ferraro's vice-presidential campaign in 1984; the America's Cup in Newport in 1983; the 1984 Los Angeles Olympics; the Bork Supreme Court nomination; the Challenger space shuttle disaster in 1986; Pope John Paul II's visit to Poland in 1987; the Reagan-Gorbechev summit in Moscow in 1988; President George H.W. Bush's visit to Europe in 1989; street kids in San Francisco; life in Poland; and portraits of presidential candidates in 1987 and 1988.  Id. at 339-40.[11]

These types of news photographs simply will not generate the kind of revenue for the number of years that Grace suggests.  Images of news events and newsworthy individuals will decline in value over time as the events and individuals fade into history.  Id. at 345 & n.14.  Images of Jimmy Carter, Geraldine Ferraro, Walter Mondale, Pope John Paul II will not generate the income today that they generated in the 1980s, nor will they generate the income ten or twenty or eighty years from now that they generate today.  Indeed, of the 732 stories listed by Grace in his partially returned stories list, some 138 were of former President Carter.  Id. at 347.

In fact, Grace's own chart shows a significant drop-off in revenues in the later years.  In 2000, 2001, and 2002, he

---

[11]    Grace's career took a different turn in 1990, away from news photography, but, as discussed above, most of the later photographs were not among the lost images.  Id. at 340 & n.3, 344, 347 & n.17.

earned under $10,000 -- combined.  (Wilson Aff. Ex. E).  Although
1999 was higher -- $12,570.60 for both New York and Paris -- much
of that income was attributable to images of Robin Williams or
Christopher Reeve, which were not among the lost images.  (See
id.; DX A (pages for 1999); DX B (pages for 1999).

        In light of all the circumstances, I find that the lost
images would have generated income for a period of 30 years --
from the time they were lost.  See Raishevich v. Foster, 247 F.3d
337, 341 (2d Cir. 2001) (affirming district court's use of 30-
year period); Grace II, 487 F.3d at 122 (noting that court in
Raishevich used 30-year period, without explaining how it chose
that length of time).  In view of the nature of the images, the
royalties that were generated, and the drop in those royalties
beginning in 2000, 30 years is fair and reasonable.  As noted,
the period from July 15, 1989 to today is 18.54 years; hence,
going forward, 11.46 years remain of the 30-year period.

        For past lost income, I multiply the annual amount of
$16,233 by 18.54 years for a total of $300,959.82; to this I will
add pre-judgment interest.

        For future lost income, Grace is entitled to "the
discounted present value of the stream of future income that the
images are expected to produce."  Grace II, 487 F.3d at 123.  I
find this would be $16,233 per year for the next 11.46 years.
This future income stream must be discounted to present value.

        Frankly, I think these computations are generous in
some respects, for I am confident that Grace's lost images would

not actually generate $16,233 a year in revenue for 30 years. The actual income stream has already dropped, and it is likely to continue to do so over time. Nonetheless, this is a damages model, one that the Circuit has suggested will likely result in a reasonable assessment of damages. In light of the difficulties presented by the absence of record-keeping of which images were imaged and which images were returned -- and Grace himself substantially contributed to the problem because he also did not keep such records -- we must do the best we can with the available information, and we must rely on certain assumptions, as the Second Circuit suggested. Grace II, 487 F.3d at 123. While I am assuming that the market value of the lost images can be determined by looking at past earnings, as I noted in Grace I, it is not just revenue that Grace has lost -- the images have a value beyond the licensing income. "Grace no longer has these images to view or hold or enjoy or otherwise do with as he wishes." Grace I, 403 F. Supp. 2d at 351.

It is true that Grace was one of the best -- if not the best -- of the photojournalists of his time. Id. at 340-41. As I recognized, he had a "unique eye." Id. at 340. The "uniqueness factor" is reflected in Grace's past earnings. See Grace II, 487 F.3d at 123. The "uniqueness factor," however, is also mitigated by certain considerations. Again, Grace's work as a photojournalist was primarily in the 1970s and 1980s, and the demand for the images in question has dwindled in time. Grace I, 403 F. Supp. 2d at 349-50. Moreover, Grace had competition; for

most of the news stories, other photographers and photojournalists were present as well.  <u>Id.</u> at 342 & n.7.  In the late 1980s, Sygma was working with 30 to 35 photographers, and in the 1970s and 1980s, there were some six to ten other photo agencies competing with Sygma.  <u>Id.</u>  Grace's images had to compete against the images generated by other accomplished photojournalists.  <u>See also</u> <u>id.</u> at 350.  Moreover, Grace usually shot many rolls of film for each story.  For many of the stories, some images were returned to Grace; hence, for these stories, he has alternative images to use.

### 6.  <u>Prejudgment Interest</u>

I calculate prejudgment interest on the lost past income, in accordance with N.Y. C.P.L.R. § 5001 <u>et</u> <u>seq.</u> (McKinney 2007).  <u>See</u> <u>Grace II</u>, 487 F.3d at 124.  Interest is to be computed "from the earliest ascertainable date the cause of action existed," or, where damages were incurred at various times, interest is to be computed "upon each item from the date it was incurred or upon all damages from a single reasonable intermediate date."  N.Y. C.P.L.R. § 5001(b).  Prejudgment interest is calculated at 9% per annum.  <u>Id.</u> § 5004.

At 9% per annum, the annual interest on $16,233 is $1,460.97.  I assume that each year's losses should have been paid at the end of the year.  For example, for the first year, July 16, 1989 through July 15, 1990, I assume $16,233 should have been paid on July 15, 1990.  From July 15, 1990 to date is approximately 17.54 years.  Hence, Grace should receive interest

on the first year's $16,233 for 17.54 years.  The annual interest
($1,460.97) multiplied by 17.54 years is $25,625.41.  For the
second year, July 16, 1990 through July 15, 1991, Grace should
receive interest on $16,233 for 16.54 years.  The annual interest
($1,460.97) multiplied by 16.54 years is $24,164.44.  I continued
these calculations for each year through July 15, 2007.  For the
final partial year (July 16, 2007 to date), I allowed interest
for .54 of a year -- $1460.97 multiplied by .54 for $788.92.  The
total of all the interest amounts is $237,728.97; I award this
amount in prejudgment interest.

### 7.  **Discounting to Present Value**

For future lost income, I find that Grace is entitled
to be paid $16,233 per year for the next 11.46 years.  These
payments must be discounted to present value.  See Grace II, 487
F.3d at 123

Corbis argues that the appropriate discount rate is
12%, the rate its expert had used in his analysis at trial.
(Def. Mem. 29).  Corbis argues that I adopted this rate in Grace
I, but that is not so -- I did refer to the analysis that used
this rate, but that was the only rate put to me at trial, and I
did not make a finding that this was the appropriate rate.  Grace
I, 403 F. Supp. 2d at 345.

Grace argues that the rate should be 2% or 1.8%.  (Pl.
Mem. 7-8).  He argues that 2% is the "default rate" in the Second
Circuit.  (Id. at 7 (citing Doca v. Marina Mercante Nicaraguense,
S.A., 634 F.2d 30, 40 (2d Cir. 1980)).  The argument misreads the

Circuit's decision.  In <u>Doca</u>, a longshoreman's injury case, the Circuit wrote only that:

> A 2% discount rate appears to be the estimate of the true cost of money appropriate for use in a computation whose purpose is to determine the present value of <u>lost future wages</u>.

634 F.2d at 39 (emphasis added).  After discussing the considerations affecting the setting of a discount rate, including adjustments for anticipated changes in interest and inflation rates, the Circuit further observed:

> We emphasize that we are not requiring the use of an adjusted discount rate, nor specifying that when such a rate is used, it must be set at 2%.  Litigants are free to account for inflation in other ways, or, if they use the adjusted discount rate approach, to offer evidence of a rate more appropriate than 2%.  But in the hope that disputes about the appropriate rate may be minimized, we simply suggest the 2% rate as one that would normally be fair <u>for the parties to agree upon</u>, and we authorize district judges to use such a rate <u>if the parties elect not to offer any evidence on the subject of either inflation or present value discount</u>.

<u>Id.</u> at 40 (emphasis added).  <u>See also</u> <u>Ammar v. United States</u>, 342 F.3d 133, 148 (2d Cir. 2003) (holding, in Jones Act case, "[w]here the parties have adduced no evidence relating to the discount rate and there has been no upward adjustment of the undiscounted lost wages figure to cover future inflation, this Court has authorized district judges to use a discount rate of 2% per year").

Grace's argument that the Circuit has set a "default rate" of 2% is rejected.  The Circuit's authorization of a 2%

rate in maritime personal injury cases, where the parties have not offered evidence on inflation and discount rates, is hardly controlling in this case, where the parties have offered evidence with respect to discount rates and risks inherent in the licensing of news photographs. A 2% rate in this case would be inappropriately low because it is a relatively risk-free rate, and for the reasons discussed above, the valuation of the future revenues of photographs is far from certain. Computing the present value of the lost future wages of a seaman is substantially different from computing the present value of lost licensing revenues from news photographs taken in the 1970s and 1980s. In other situations, some courts have used substantially higher discount rates (18% and 18.5%). (<u>See</u> Def. Mem. 25 (citing cases)).

Under all the circumstances, based on the evidence before me, and in light of the risks involved, I will use a 5% discount rate.

To discount to present value payments of $16,233 annually for the next 11.46 years using a 5% discount rate, I did the following: I divided $16,233 by 1.05% for the first year; that yields $15,460. In other words, $15,460 invested today at 5% will yield $16,233 in one year. For the second year, I divided $15,460 by 1.05%, which yields $14,723.81. In other words, $14,723.81 invested today at 5% will yield $16,233 in two years. I continued these calculations for the remaining years; the final period is a partial year -- .46 of a year. I added all

these amounts to arrive at a sum of $138,996.00. In other words, the sum of $138,996 invested at 5% today will yield annual payments of $16,223 for 11.46 years.

## CONCLUSION

Accordingly, I award Grace $677,684.79, consisting of lost past income of $300,959.82 plus prejudgment interest on that amount of $237,728.97 plus $138,996 as the present value of annual payments of $16,233 for the next 11.46 years.

The Clerk of the Court shall enter judgment in favor Grace in the amount of $677,684.79, with costs but without fees.

SO ORDERED.

Dated:   New York, New York
         January 31, 2008

DENNY CHIN
United States District Judge